(No. 34188.—

LOLITA KRUTSINGER *et al.*, Appellees, *vs.* ILLINOIS CASUALTY COMPANY, Appellant.

*Opinion filed January 24, 1957—Rehearing denied March 19, 1957.*

MORAN, KLOCKAU, MCCARTHY & JOHNSON, of Rock Island, and LOREN E. MURPHY, of Monmouth, (BERNARD J. MORAN, of counsel,) for appellant.

JOHN L. FRANKLIN, of Champaign, for appellees.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

This is an action against an insurance company on the ground that it failed to satisfy judgments entered against its insured. The company contended that various circumstances relieved it of liability under its policy. The trial court found against these contentions and entered judgments for the plaintiffs. The Appellate Court affirmed, (10 Ill. App.2d, 344,) and the case is here on leave to appeal.

The original action was commenced in the circuit court of Champaign County on June 2, 1953, on behalf of Lolita, Kenneth and Karen Krutsinger, minors, by Dolores Krutsinger, their mother and next friend. Four of the six defendants operated taverns in Champaign or Urbana, and the other two operated package liquor stores. Among the defendants were Mandel, Mildred and Norman Barnett, who operated a package liquor store as partners. The complaint alleged that the defendants had violated sections 12 and 14 of article VI of the Liquor Control Act, (Ill. Rev. Stat. 1955, chap. 43, pars. 131, 135,) by selling alcoholic beverages to the plaintiffs' father, Leslie Krutsinger, a known habitual drunkard, and thereby injuring their means of support. Actual and exemplary damages in the amount of $15,000 were sought by each plaintiff.

The defendants were insured by six different insurance carriers, including Illinois Casualty Company, the defendant in the present action, during the period alleged in the complaint. All but one of the defendants had been insured during some part of that period by Illinois Casualty. That company had issued a policy to the Barnetts that provided coverage of $50,000 for loss of means of support. The policy was in effect from September 29, 1951, until July 7, 1952, when the company terminated all its policies in Champaign County.

The policy contained the usual provisions that the insured should give the company immediate written notice of any claim or suit and should transmit to the company any summons or other process served upon him. The insurer reserved to itself the exclusive right to defend or settle any suit or claim, and the policy prohibited the insured from interfering with any suit or making any settlement except at his own cost.

Summons in the original action was served on the Barnetts on June 6, 1953. On June 25, 1953, Robert J. Milum, of the agency from which the Barnetts had purchased their insurance, wrote a letter to Illinois Casualty Company. The letter stated the pendency of the dramshop action "filed on a habitual drunkenness count which runs from August 1951 up to the present time," its return day, and that notification was made of possible liability as to five of the six defendants, including the Barnetts. It also stated accurately the period during which the defendants were covered by policies issued by Illinois Casualty, and named the present insurers where they were known. On June 19 Illinois Casualty's general counsel telephoned John A. Appleman, who represented the plaintiffs. He said that he had received Milum's letter and requested Appleman not to default "any of these people," pending further investigation. Appleman agreed.

About a week later an attorney for Illinois Casualty went to Champaign and obtained a copy of the complaint. He learned that answers had already been filed. Illinois Casualty's general counsel testified that he concluded that the liability asserted was not within the Illinois Casualty's policy coverage and that for that reason, plus the fact that answers covering the entire period had been filed by other lawyers, his law firm did not enter into the defense of the Barnetts.

Illinois Casualty did not confer with the attorneys for

the defendants or with other insurers to make arrangements for sharing the burden of defense. Other attorneys, however, were active. They filed amended answers, investigated the facts, and explored the possibility of settlement. The case was originally set for trial on February 15, 1954, continued to February 23, and then reset for April 5.

In February of 1954 Illinois Casualty was advised that negotiations for settlement were in progress, but declined to participate in them. Negotiations then proceeded as to periods other than those covered by Illinois Casualty policies. On March 26, 1954, plaintiffs served notice that they would ask leave to file an amended complaint *instanter* and seek a short rule upon the defendants to plead thereto. On that day the attorneys for the Barnetts and other defendants mailed a copy of the notice and the proposed amended complaint to Illinois Casualty, stating that five defendants "expect you to defend the action pending for the periods covered by the insurance issued by Illinois Casualty Company," and giving notice that the cause was set for April 5 at 9:30 A.M. Leave to amend was granted. The amended complaint limited the plaintiffs' action to claims for damages in the aggregate amount of $26,000 under section 14 of division VI of the Liquor Control Act (par. 135) and omitted the claim for punitive damages. On March 29, an attorney for the defendants wired Illinois Casualty's attorneys: "Defendants ruled to plead to amended complaint at 9:30 A.M., April First." Illinois Casualty did not seek an extension of time within which to plead, nor did it file a pleading. Instead, the attorneys for Illinois Casualty wrote to attorneys for the defendants, expressing the view that the amended complaint stated an entirely different cause of action than that contained in the original complaint and declining to defend the case.

Upon Illinois Casualty's refusal to participate in the settlement negotiations, the other parties proceeded to con-

sider a settlement of claims for periods not covered by Illinois Casualty policies, and a covenant not to proceed against personal assets of the defendants in the collection of any judgments that might be recovered. An agreement was reached, and a petition was filed in the county court of Champaign County by the guardian of the minor plaintiffs, seeking approval of the agreement. The petition recited that Illinois Casualty had refused to cooperate toward a common settlement; that the other insurance carriers had offered to contribute $4800 upon any judgments that might be rendered against the defendants in the circuit court, apportioned as follows: $1800 to Karen Krutsinger, $1600 to Kenneth Krutsinger and $1400 to Lolita Krutsinger; that this offer was based on the condition that the plaintiffs would agree to look solely to Illinois Casualty for the remaining portion of any judgments rendered in their favor by the circuit court. By an accompanying stipulation, undated at the time but later dated May 5 and filed May 13, entered into by the guardian of the Krutsinger minors and their mother, on the one hand, and on the other by all the defendants in the dramshop case, the latter agreed to pay the sums stated. The county court approved the proposed agreement, conditioned upon the success of plaintiffs in the litigation.

The stipulation was executed on April 2. Thereupon one of the attorneys for the defendants sent the following telegram to Illinois Casualty's attorneys: "Illinois Casualty Company has sole burden of defending Krutsinger case Circuit Court Champaign County. No other defense being made."

On April 2, 1954, the Barnetts and the other defendants who were insured by Illinois Casualty received a letter from Illinois Casualty's attorneys dated April 1. The letter asserted numerous breaches of conditions of the policy and concluded with a proposed certification that the insured

had read and understood the letter; that he desired Illinois Casualty to proceed with the defense of the action, and that his signature "constitutes my acceptance of all the terms of said letter." The attorney for the defendants promptly telephoned Illinois Casualty's attorneys that "the people will not sign a non-waiver agreement." At that time the stipulation, although signed, had not been delivered. He advised Illinois Casualty that "it is not too late to talk if Illinois Casualty wants to get in here on a full release basis." On April 3 the attorney for the defendants filed an answer denying the allegations of the amended complaint.

The case proceeded to trial, and on April 5, 1954, verdicts were rendered in favor of the Krutsingers and against defendants for $6000 (Karen), $4000 (Lolita) and $4800 (Kenneth.) Credits were allowed, in accordance with the stipulation, and the judgments entered on the verdicts were reduced accordingly.

On May 5, 1954, the Krutsingers brought the present action against Illinois Casualty Company, (hereinafter referred to as defendant,) to collect the judgments. The action was based on the policy issued to the Barnetts, and the complaint alleged the issuance of the policy, the entry of judgments against the Barnetts, and the defendant's failure to satisfy the judgments. Defendant's answer set up six special defenses. At the close of all the evidence, plaintiffs' motions to withdraw from the jury the issues presented by the separate defenses, and for directed verdicts, were allowed. Accordingly, directed verdicts for $4361.58, $3223.11 and $2700.02, were returned in favor of Karen, Kenneth and Lolita Krutsinger, respectively. Judgments were entered on the verdicts, and the defendant appealed.

In the trial and Appellate Court defendant urged that it was relieved of liability because its insured had not given it notice of the suit and had not delivered the summons to the defendant. That contention is waived in this court

in view of our decision in *Simmon* v. *Iowa Mutual Casualty Co.* 3 Ill.2d 318. In this court defendant contends first that the Barnetts violated the policy condition that the defendant should have the exclusive right to contest any suits against the insured by filing a full and complete answer to the original complaint on July 3, 1953.

Under the circumstances of this case that defense is not available. The original complaint in the dramshop action alleged that the Barnetts, among others, had made alcoholic liquors available to Leslie Krutsinger between September 28, 1951, and March 15, 1952, and from July 20, 1952, until the action was filed. Defendant cancelled its Champaign County policies on July 7, 1952. It was thus at once apparent that the action embraced periods of time beyond that during which defendant's policy was in effect. In this situation the fact that the *ad damnum* of the complaint was less than the policy limits, a fact that the defendant stresses, loses significance. The point is made, no doubt, to avoid the implications of the cases which hold that when the damages sought in an action against an assured are in excess of the policy limits "the insurer's conduct will be subject to closer scrutiny than that of the ordinary agent, because of his adverse interest." (*Traders & General Insurance Co.* v. *Rudco Oil & Gas Co.* 129 F.2d (C.A. 10th Cir.) 621, 627.) The implications that follow from this settled rule cannot be avoided here by pointing to the policy limits, for here the policy does not cover the entire period involved in the complaint.

If nothing but the Barnetts' personal liability on the period beyond the coverage of the insurance policy was involved, it would still have been the duty of the defendant to share the defense with them. "Where there are grounds of liability asserted * * * for some of which the insurer is liable and for some of which the insured must stand the loss, neither party has the right, without fault on the part of the other, to exclude the other from par-

ticipating in the defense in a case like this." *Fidelity &
Casualty Co.* v. *Stewart Dry Goods Co.* 208 Ky. 429, 271
S.W. 444, at 448.

Actually, however, the defendant knew from the very
outset that other insurance companies were involved. De-
fendant's obligation to share the defense with them was
unmistakable. Defendant did not originally take a position
inconsistent with this interpretation of its rights and obli-
gations under the policy. In a letter dated June 29, 1953,
to plaintiffs' attorney, defendant's attorney stated: "I think
your suggestion a good one that you furnish me the names
of those lawyers who enter an appearance on behalf of
each of these defendants so that we may in turn contact
them and make our arrangements for sharing the burden
of defense." The circumstances made it impossible for the
defendant, any more than the other insurers, to insist upon
the exclusive right to control the litigation.

When an insurer wishes to assert its nonliability under
the policy, it must notify the insured without delay. The
reason is that "[t]he claim might be of such a character
as that the amount of damages recovered in a lawsuit by
the injured party would exceed the indemnity and subject
the insured to considerable loss and damage, and therefore
the insured should have a right to know with reasonable
promptness the attitude of the indemnity company, so that
he might be in a position to take such action as would not
only protect the indemnity company, but save himself from
loss and damages." (*Interstate Casualty Co.* v. *Wallins
Creek Coal Co.* 164 Ky. 778, 781, 176 S.W. 217, 219.)
Yet the defendant, by its own testimony, did nothing until
March of 1954. Then it filed, in another county, an action
for a declaratory judgment of nonliability. That action
was apparently abandoned, but it was the first formal notice
that the insured and the other insurers received of the
defendant's attitude.

By its failure to repudiate the answer of July 3, 1953, or to seek leave to amend it if it was unsatisfactory, and by its failure to do anything further until many months later, we think that defendant effectively waived any rights it might have had to claim a breach of the policy conditions it relies on. An insurer who undertakes the defense of a suit against the insured, where the damages sought are in excess of policy limits, cannot arbitrarily refuse a settlement within policy limits. And the insured can recover the amount of the judgment rendered against him, including the amount in excess of policy limits, when the insurer has been guilty of bad faith in failing to effect a settlement for a smaller sum. (*Radcliffe* v. *Franklin National Insurance Co. of New York*, 298 P.2d (Ore.) 1002; *Home Indemnity Co.* v. *Williamson*, 183 F.2d (C.A. 5) 572; 40 A.L.R. 2d 168.) In such a case the insured may effect a reasonable settlement himself without breaching any conditions of the policy. (*Evans* v. *Continental Casualty Co.* 40 Wash.2d 614, 245 P.2d 470.) Clearly the insured may effect a reasonable settlement where the insurer refuses to defend, either expressly (*Traders & General Insurance Co.* v. *Rudco Oil and Gas Co.* 129 F.2d (C.A. 10) 621,) or impliedly through failure to act promptly. *Interstate Casualty Co.* v. *Wallins Creek Coal Co.* 164 Ky. 778, 176 S.W. 217.

Defendant, however, contends that it was willing to undertake the defense as of April 1, 1954, and that it was the Barnetts' failure to execute the nonwaiver agreement tendered to them on that date that caused it to refuse to defend. Without determining whether an insurer is entitled to a nonwaiver agreement at all under these circumstances, it is clear that defendant could not require the acceptance of the particular agreement that it tendered. It sought not only to avoid any waiver that might result from presently undertaking the defense, but it sought also to avoid,

in detail, any waivers which might have previously taken place. With this purpose in view, the agreement presented a series of conclusions of fact, some of which carried unsavory implications of fraud, with respect to events that had taken place before April 1, 1954. The Barnetts quite properly refused to sign the document.

Defendant's final argument is that the negotiations for a settlement were collusive and not in good faith. Negotiations began in the middle of February, 1954. On February 18 and 19, counsel for the Barnetts made repeated efforts, by telephone, to draw defendant into the negotiations, with no success. Defendant charges, however, that the parties arrived at an agreement prior to March 29, 1954, the date of the amended complaint, and embodied it in a stipulation which they worded "so that it would appear that it had been drafted after judgments were obtained and existing against the Barnetts" and which they dated May 5, 1954, although it was executed April 2, 1954; that after the stipulation had relieved them of all personal liability upon payment of $4800, the Barnetts, through their attorneys, filed the answer of April 3, 1954, to give the trial "the appearance of a contested cause." We are unable to give these facts the sinister interpretation put upon them by defendant. The order of settlement approved in the county court on April 1, 1954, expressly made the approval "conditional upon the success of the plaintiffs in the said litigation and the entry of judgment  *  *  *." It is clear from the record that the answer filed on April 3, 1954, was filed not only on behalf of the Barnetts but also on behalf of insurance carriers other than defendant. Moreover, that answer kept open to the defendant the possibility of appearing and contesting liability if it desired to do so. The situation that confronted the other defendants and their insurers was an unusual one, and the means adopted to meet it were not inappropriate. The Appellate Court commented

adversely upon the defendant's wanton charges of fraud and collusion, and in our opinion that comment was warranted. The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*